UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

BAKERY, CONFECTIONERY,
TOBACCO WORKERS and GRAIN
MILLERS, INTERNATIONAL UNION
and LOCAL UNION NO. 3-G. BAKERY,
CONFECTIONERY, TOBACCO
WORKERS AND GRAIN MILLERS,

    Plaintiffs,

v.                                          Case No. 1:16-CV-1180

KELLOGG COMPANY,                  HON. GORDON J. QUIST

    Defendant.
_____/

## OPINION REGARDING UNIONS' MOTION
## TO COMPEL ARBITRATION

      Plaintiffs, Bakery, Confectionery, Tobacco Workers and Grain Millers, International Union AFL-CIO, CLC (International Union) and Local Union No. 3-G, Bakery, Confectionery, Tobacco Workers and Grain Millers (Local Union), filed an amended complaint against Defendant, Kellogg Company, pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, alleging that Kellogg failed to pay a contract ratification bonus to casual employees (now referred to as transitional employees).[1] Count I of the amended complaint alleges that Kellogg failed to arbitrate Grievance 40-15, concerning Kellogg's refusal to pay the ratification bonus to casual employees, and Count II alleges nonperformace by Kellogg and requests a jury trial in the event the Court declines to compel arbitration.

---

[1] Only the Local Union filed the initial complaint. In response to Kellogg's motion to dismiss for failure to join the International Union as a necessary party under Federal Rule of Civil Procedure 19, the Local Union amended its complaint to add the International Union as a party.

The Unions move to compel Kellogg to arbitrate. The Court heard oral argument on the motion on September 11, 2017. For the following reasons, the Court will deny the Unions' motion.

## I. BACKGROUND

### A. The Parties' Agreements

Kellogg is a manufacturer of breakfast foods, including ready-to-eat cereal. The International Union, through local affiliates, represents production and maintenance employees at Kellogg's four ready-to-eat cereal plants, two of which are located in Battle Creek, Michigan, and Memphis, Tennessee. (ECF No. 12-3.) *See Kellogg Co. v. NLRB*, 840 F.3d 322, 325 (6th Cir. 2016). The Local Union is the bargaining unit for production and maintenance employees at the Battle Creek Plant.

The parties' collective bargaining relationship is governed by two separate agreements. The first—the so-called Master Agreement—applies to employees at all four plants. The second agreement—known as the Supplemental Agreement—is the product of bargaining at the local level and is specific to Battle Creek employees. The Master Agreement covers "only those matters specifically included" in that agreement, and provides that the Supplemental Agreement (and the separate supplemental agreements entered into at Kellogg's other facilities) shall govern "except as specifically amended or modified by [the Master] Agreement." (ECF No. 12-3 at PageID.1074.)

In addition to its regular employees, Kellogg has a "casual employee" program at its Battle Creek Plant. Casual employees "provide regular employees with relief from extended work schedules." (ECF No. 12-2 at PageID.1054.) Such employees may generally not be used when regular employees are on layoff or want to work overtime. (*Id.*) With the exception of one limited reference in the Master Agreement, the terms of employment for casual employees are governed exclusively by a Memorandum of Agreement appended to the Supplemental Agreement, captioned,

"Guidelines for Utilization of Casual Employees." (*Id.*) The Memorandum of Agreement states, in part:

> The terms and conditions of the Supplemental and Master Agreements will not apply to Casual employees. Only the following fringe benefits will be granted to Casual employees, and they will not accumulate seniority:
>
> • Uniforms
> • Lunch and Breaks
> • Shift Differential
> • Wage Appendix of the Master Agreement-COLA

(*Id.*)

**B.    The Ratification Bonus**

The Master Agreement in effect during the summer of 2015 was set to expire in October 2015. However, due to economic challenges in the breakfast cereal market, Kellogg entered into early negotiations with the Unions regarding the successor Master Agreement, with the goal of obtaining certain concessions in exchange for a five-year moratorium on Kellogg's ability to close the ready-to-eat cereal plants. On July 17, 2015, Kellogg presented the Unions a Best Offer/Memorandum of Agreement (MOA), pursuant to which Kellogg agreed to pay each employee a $15,000 bonus for ratification of the MOA by August 2, 2015. (ECF no. 12-5 at PageID.1171.) The Unions accepted the offer and held a contract ratification vote on July 31, 2015. (ECF No. 7 at PageID.497.) The votes were counted on August 1, 2015, and the MOA was approved by the employees. (*Id.*)

Following the ratification, Kellogg paid the ratification bonus to all regular employees but did not pay the bonus to casual employees. The Local Union argued that Kellogg was obligated to pay the ratification bonus to casual and seasonal employees. Kellogg disagreed, and the Local Union filed a grievance. (*Id.*) The Local Union pursued the grievance through each step of the grievance process without a resolution. On June 20, 2016, the Local Union requested arbitration.

(*Id.* at PageID.497–98.) However, Kellogg refused to arbitrate, claiming that the grievance was not arbitrable.

C. **The Memphis Plant Case**

In 2013, Kellogg and the Memphis local union began negotiations for a successor to the Memphis supplemental agreement, which was set to expire in October 2013. Memphis, like Battle Creek, also had a casual employee program that was governed by the Memphis supplemental agreement. *Kellogg Co.*, 840 F.3d at 325. The provisions of the Memphis supplemental agreement pertaining to casual employees were materially indistinguishable from the casual employee provisions in the Battle Creek Supplemental Agreement. *Id.* As part of the negotiations, Kellogg proposed modifications that would expand Kellogg's use of casual employees by allowing Kellogg to employ them on an indefinite basis and use them to perform production or other bargaining unit work. The proposal also gave casual employees new rights not provided under the current agreement, including seniority rights and access to the grievance procedure. *Id.* at 326. The parties eventually reached an impasse, and Kellogg locked out the bargaining unit employees. After the local union filed a complaint with the National Labor Relations Board, an ALJ concluded that the parties had reached a bona-fide impasse and that Kellogg was entitled to impose a lockout. *Id.* The NLRB reversed, concluding that Kellogg's proposals altered the Master Agreement mid-term and that Kellogg therefore had no basis to threaten a lockout to compel acceptance of its proposal. *Id.* at 327.

Kellogg petitioned for review. The Sixth Circuit granted the petition and vacated the portion of the NLRB's decision regarding Kellogg's right to impose a lockout. *Id.* at 332–33. The International Union and the Memphis local intervened in the Sixth Circuit case and, in their brief to that court, stated—as they also had done before the NLRB—that Kellogg's "proposal . . . red-

4

lined the Supplemental Agreement to insert 'Regular and Casual employees' into virtually every provision that previously had pertained only to regular employees[,] . . . conferr[ing] on the new class of 'casual' employees rights such as . . . access to the grievance procedure." (ECF No. 12-9 at PageID.1236–37.) Consistent with this representation, the Sixth Circuit noted that Kellogg's proposal would grant casual employees "new rights, such as . . . access to a grievance procedure." *Id.* at 326.

## II. DISCUSSION

The Unions argue that they are entitled to an order compelling Kellogg to arbitrate based on the following definitions of "grievance" set forth in the Master Agreement and Supplemental Agreement: "any dispute involving the application or interpretation of any provision of this Agreement" (ECF No. 12-3 at PageID.1096) (Master Agreement); and "any complaint, dispute, or difference of opinion concerning any matter" (ECF No. 12-2 at PageID.1018) (Supplemental Agreement).

The federal policy favoring arbitration of labor disputes is well established. That is, arbitration is an important means of "promot[ing] industrial stabilization . . . [and] achieving industrial peace." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578, 80 S. Ct. 1347, 1350 (1960); *see also United Steelworkers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277 (6th Cir. 2007) ("In deciding the arbitrability of a dispute, we begin with the presumption that national labor policy favors arbitration."). The following principles guide a court's decision on a motion to compel arbitration:

> 1) a party cannot be forced to arbitrate any dispute that it has not obligated itself by contract to submit to arbitration; 2) unless the parties clearly and unmistakably provide otherwise, whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is a question for judicial determination; 3) in making this determination, a court is not to consider the merits of the underlying claim; and 4) where the agreement contains an arbitration clause, the court should

> apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*Id.* at 277–78 (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–50, 106 S. Ct. 1415, 1418–19 (1986)). When a collective bargaining agreement contains a broad arbitration clause, "arbitration will be denied only if an express provision excludes a particular grievance from that forum." *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 486 (6th Cir. 2006) (citing *United Steelworkers of Am. v. Mead Corp.*, 21 F.3d 128, 131 (6th Cir. 1994)). In such circumstance, the resisting party "must present 'the most forceful evidence of a purpose to exclude the claim from arbitration' to prevail." *Teamsters Local Union No. 89 v. Kroger Co.*, 617 F.3d 899, 906 (6th Cir. 2010) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 585, 80 S. Ct. 1347, 1354 (1960)).

**A.     Judicial Estoppel**

Kellogg argues that, based on the International Union's position and the Sixth Circuit's decision in the Memphis plant case, the Court need not decide whether the arbitration provisions in the Master and Supplemental Agreements apply to grievances concerning casual employees because the Unions are judicially-estopped from arguing that the arbitration/grievance provisions apply to casual employees.

Courts employ the doctrine of judicial estoppel to prevent "the perversion of judicial machinery." *Reynolds v. Comm'r*, 861 F.2d 469, 472 (6th Cir. 1988) (internal quotation marks omitted). The doctrine "forbids a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." *Great Earth Cos. v. Simons*, 288 F.3d 878, 892 (6th Cir. 2002) (internal quotation marks omitted); *see also Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002) (judicial estoppel bars a party from asserting a position contrary

to one that it took in a prior proceeding if "the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition'" (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990)). The Supreme Court has observed that the "circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S. Ct. 1808, 1815 (2001), though it has identified three factors that may help to inform the analysis:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled[.] Absent success in a prior proceeding, a party's later inconsistent position risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750–51, 121 S. Ct. at 1815 (internal quotation marks and citations omitted). Judicial estoppel "should be applied with caution to 'avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement.'" *Eubanks v. CBSK Fin. Grp., Inc.*, 385 F.3d 894, 897 (6th Cir. 2004) (quoting *Teledyne Indus.*, 911 F.2d at 1218).

At first blush, the circumstances would appear to warrant application of judicial estoppel. That is, contrary to the Unions' characterization of the International Union's prior representations to the Sixth Circuit, the International Union's position in the instant case is clearly inconsistent with the position it took in the Memphis plant case. It told the Sixth Circuit that casual workers had no right to access the grievance/arbitration process. Here, it claims otherwise. In addition, in its opinion, the Sixth Circuit stated—consistent with the International Union's representations—that Kellogg's proposal would give casual employees a new right of access to the grievance procedure

7

that they did not previously enjoy. *Kellogg Co.*, 840 F.3d at 326. On the other hand, while casual employees' new right of access to the grievance procedure was part and parcel of the International Union's argument that Kellogg's proposal effectively modified terms for regular employees set forth in the Master Agreement, there was never any issue in the case about whether casual employees had an existing right of access to the grievance procedure, and the Sixth Circuit did not decide that issue. In fact, in light of Kellogg's success before the Sixth Circuit, it is difficult to see how the International Union—which defended the NLRB's decision—could be considered successful in persuading the Sixth Circuit to accept its position. Finally, and perhaps most importantly, Kellogg has not shown, nor even argued, that, estoppel is necessary to prevent the International Union from receiving an unfair benefit or Kellogg from being unfairly harmed by the International Union's conduct in the Memphis plant case.

Accordingly, the Court declines to apply judicial estoppel.

**B.     Contractual Analysis**

Although the Court will not estop the Unions in this case, the Court nonetheless concludes that the International Union and Kellogg had it right in the Memphis plant case. Applying ordinary principles of contract interpretation, the Court must determine what the parties intended. *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015). The parties' intent is expressed in clear and unambiguous terms: "The terms and conditions of the Supplemental and Master Agreements will not apply to Casual employees." (ECF No. 12-2 at PageID.1054.) Although the provision goes on to describe the limited fringe benefits that casual employees receive, it does not qualify the unambiguous language in the prior sentence stating that the "terms and conditions"—including the grievance/arbitration provisions—of the Master and Supplemental Agreements do not apply to casual employees. This unqualified exclusion constitutes "the most forceful evidence of a purpose

8

to exclude . . . claim[s] [regarding casual workers] from arbitration." *Warrior & Gulf Nav. Co.*, 363 U.S. at 585, 80 S. Ct. at 1354.

The Unions argue that, when considered in context, it is reasonable to interpret the phrase, "The terms and conditions of the Supplemental and Master Agreements will not apply to Casual employees," as referring only to fringe benefits provided by the Supplemental and Master Agreements, rather than as a wholesale limitation on all terms and conditions, including the grievance and arbitration provisions. The Unions argue that because the next sentence goes on to describe the fringe benefits set forth in the Supplemental and Master Agreements to which casual employees are entitled, the Court should construe the exclusion as applying only to fringe benefits. At oral argument, the Unions' counsel argued that further support for this interpretation is found in paragraph 8 of the Memorandum of Agreement, which states: "The Company may discontinue employment without such action being subject to the grievance procedure." (ECF No. 12-2 at PageID.1055.) The Unions contend that, if casual employees have no right of access to the grievance procedure, as Kellogg contends, paragraph 8 would have been unnecessary.

The Court rejects the Unions' interpretation because it is contrary not only to the plain language in the Memorandum of Agreement, but also plain and unambiguous language in both the Supplemental and Master Agreements. To explain: Section 1.01(d) of the Master Agreement provides that "[t]he term 'employees' whenever used in this Agreement and for the purposes hereof shall include all those employees included in each bargaining unit as defined in each Supplemental Agreement." (ECF No. 1-1 at PageID.14.) Section 201(a) of the Supplemental Agreement similarly provides that "the terms of this Supplemental Agreement . . . cover [] only employees within the bargaining unit." (ECF No. 1-2 at PageID.127.) Section 201(b), in turn, defines the bargaining unit as "all regular hourly employees in the Battle Creek plant of the Company." Consistent with these

9

provisions, the Memorandum of Agreement distinguishes between regular employees (bargaining unit members) and casual employees (non-bargaining unit employees) and confirms that "[t]he terms and conditions of the Supplemental and Master Agreements will not apply to Casual employees." These provisions make clear both that provisions in the Supplemental and Master Agreements apply only to regular employees and not casual employees and that the fringe benefits set forth in the Memorandum of Agreement for casual employees are not fringe benefits extended from the Supplemental and Master Agreements, but instead are separately and independently conferred by the Memorandum of Agreement. In light of the intent clearly expressed in the Supplemental and Master Agreements and the Memorandum of Agreement, paragraph 8 of the Memorandum of Agreement simply reinforces the parties's understanding that no provision of the Supplemental or Master Agreement applies to casual employees.

### III. CONCLUSION

For the foregoing reasons, the Court will deny the Unions' motion to compel.

A separate order will enter.

Dated: September 13, 2017                 /s/ Gordon J. Quist
                                                        GORDON J. QUIST
                                   UNITED STATES DISTRICT JUDGE